[Cite as *Lhamon v. Prater*, 2009-Ohio-5904.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

ERIN K. LHAMON,                                   CASE NO. 1-09-34

   PLAINTIFF-APPELLANT,

  v.

TERRY P. PRATER, ET AL.,                          O P I N I O N

   DEFENDANTS-APPELLEES.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2008-0486

**Judgment Affirmed**

Date of Decision:  November 9, 2009

APPEARANCES:

   *Victoria U. Maisch* **for Appellant**

   *Dawn M. Frick* **for Appellee**

**PRESTON, P.J.**

{¶1} Plaintiff-appellant, Erin K. Lhamon (hereinafter "Lhamon"), appeals the judgment of the Allen County Court of Common Pleas, which granted defendant-appellee's, Fort Defiance Construction & Supply Co., Inc. (hereinafter "Fort Defiance"), motion for summary judgment. For the reasons that follow, we affirm.

{¶2} This matter stems from a motorcycle accident that took place in the early morning hours of June 30, 2007. The general facts of the case are largely not in dispute. Around January 2007, Fort Defiance obtained a construction project through a bid with the Ohio Department of Transportation (hereinafter "ODOT") for Construction Project 06-0502, which was the improvement of State Route 81, also known as Allentown Road (hereinafter "the project"). Pursuant to the contract, Fort Defiance was required to have an engineer draft a Maintenance of Traffic plan (hereinafter "MOT") in accordance with the project's General Specifications and the Ohio Manual of Uniform Traffic Control Devices (hereinafter "OMUTCD"). A MOT was prepared by Fort Defiance and approved by ODOT. The project was broken down into three phases. Phase I consisted of the reconstruction of the westbound lane of Allentown Road; specifically, the two westbound lanes were closed and traffic was rechanneled to the eastbound side of Allentown Road. This rechannelization began at or about the intersection of

Allentown Road and Cable Road. At the time of the accident, the project was in the process of Phase I.

{¶3} In the early morning hours of June 30, 2007, Lhamon was a passenger on defendant Terry P. Prater's (hereinafter "Prater") motorcycle. While on the motorcycle, Prater proceeded west on Wayne Street, until it merged into Allentown Road, at which time he continued west on Allentown Road and into the intersection at Cable Road. Neither party remembers the details of the actual accident, but it is undisputed that Prater failed to make a lane shift to the left through the intersection, subsequently traveled into the Fort Defiance construction site, and lost control of the motorcycle. Both Prater and Lhamon sustained injuries and were taken to a hospital for medical treatment.

{¶4} On April 1, 2008, Lhamon filed a complaint against Prater and defendant-appellee, Fort Defiance, alleging negligence claims against both parties for the injuries she sustained on June 30, 2007. Subsequently, Fort Defiance filed a motion for summary judgment and Lhamon submitted a memorandum in response. The trial court issued its opinion on May 29, 2009, and ultimately granted Fort Defiance's motion for summary judgment and dismissed Lhamon's complaint against Fort Defiance. In addition, the trial court made a determination that there was no just reason for delay and that its decision was a final judgment pursuant to Civ.R. 54.

{¶5} Lhamon now appeals and raises two assignments of error. Because both of Lhamon's assignments of error deal with the trial court's grant of Fort Defiance's motion for summary judgment, we elect to address them together; however, we will address each breach alleged by Lhamon separately.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED WHEN IT FAILED TO CONSTRUE ALL THE EVIDENCE IN A LIGHT MOST FAVORABLE TO THE NONMOVING PARTY IN THE DETERMINATION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO CIV. R. 56 BY FINDING THAT PLAINTIFF DID NOT DEMONSTRATE A GENUINE ISSUE OF FACT THAT DEFENDANT FORT DEFIANCE CONSTRUCTION & SUPPLY CO., INC.'S NEGLIGENCE WAS THE PROXIMATE CAUSE OF PLAINTIFF'S INJURIES.**

{¶6} Both of Lhamon's assignments of error raise issues with the trial court's ruling on Fort Defiance's motion for summary judgment. We review a decision to grant summary judgment de novo. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Under this standard of review, we review the appeal independently, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991. A motion for summary judgment will be granted only when the

requirements of Civ.R. 56(C) are met. Thus, the moving party must show: (1) that there is no genuine issue of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150.

{¶7} The party asking for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 116, 526 N.E.2d 798. The moving party must also demonstrate the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Then the moving party must demonstrate that they are entitled to summary judgment as a matter of law, at which time, the burden then shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. *Deutsche Bank Trust Co. v. McCafferty*, 3d Dist. No. 1-07-26, 2008-Ohio-520, ¶9, citing Civ.R.56(E).

{¶8} At the outset, both of Lhamon's assignments of error deal with the negligence claim she filed against Fort Defiance. We have previously stated that

in order to defeat a motion for summary judgment filed by a defendant in a negligence action, a plaintiff must show that when the evidence is considered most favorably to plaintiff that (1) the defendant owed her a duty, (2) that the defendant breached its duty, (3) an injury resulted, and (4) the breach of duty was the proximate cause of the injury. *Cottrill v. Knaul*, 3d Dist. No. 9-07-12, 2007-Ohio-5196, ¶7, citing *Hemmelgarm v. Vagedes*, 3d Dist. No. 10-04-14, 2005-Ohio-673, ¶12, citing *Mowery v. McCracken* (Aug. 31, 1987), 3d Dist. No. 5-85-33, at *2. Neither party disputes the fact that under the MOT with the State, Fort Defiance owed a duty to the general traveling public to exercise due care in carrying out its obligations pursuant to the MOT. However, what is in dispute is whether Fort Defiance breached its duty and whether its breach was the proximate cause of Lhamon's injuries. Specifically, Lhamon claims that Fort Defiance breached its duty of care in two ways: (1) by using grabber cones instead of drums, which was specified in the MOT as the channelization device to use on the project; and (2) by placing a pile of stones at the east end of the construction site. We will address the two alleged breaches separately.

### Cones v. Drums

{¶9} With respect to using grabber cones instead of drums, Lhamon claims that the trial court did not properly construe all of the evidence in a light most favorable to her (the nonmoving party) when it determined Fort Defiance's

summary judgment motion. Specifically, she claims that the trial court erred by focusing solely on the testimony of John Shanahan (hereinafter "Shanahan"), who was ODOT's project engineer/supervisor with Fort Defiance. Lhamon further claims that the trial court ignored Prater's testimony, along with the contractual language in the MOT and the General Specifications.

{¶10} Our review of the record reveals that, regarding the night of the accident, Prater testified as follows:

> **Q. Tell me as much as you can about what you recall leading up to the accident and then the accident.**
> **A. I just, about the only thing I remember, I mean riding the bike, kind of talking to her, there was a car in front of me when I got on Allentown Road, I believe they merged over and turned, I had the green light and I proceeded through, that's about the last I remember.**
>
> **\* \* \***
>
> **Q. Okay. You were aware there was construction, that's why you avoided it?**
> **A. Yes, it had been there for quite awhile.**
> **Q. Okay. You said you were talking to her, do you have the kind of helmets that have the intercoms that you can talk?**
> **A. No.**
> **Q. Were you wearing a helmet at all?**
> **A. No.**
> **Q. Okay. So just as you're driving you could speak to one another?**
> **A. You could or when I stopped, you know, I mean…**
> **Q. Okay. Do you have any recollection of what you guys were talking about?**
> **A. No.**
> **Q. You said you remembered a car in front of you?**
> **A. Yeah.**

Q.  Okay.  Do you remember what kind of car that was?
A.  No.
Q.  You think it merged onto Allentown off of Wayne with you?
A.  No, I don't believe so.
Q.  Okay.
A.  The only reason I remember the car was because it slowed down, it seemed like it would slow down and speed up, slow down and speed up.
Q.  Okay.  Do you know how fast you were going down Allentown?
A.  Approximately 35.
Q.  Do you know what the speed limit is?
A.  I believe it's 35.
Q.  Okay.  So what happened, tell me to the extent you know why, I mean what you did, what the motorcycle did, when you entered into the intersection of Allentown and Cable.
A.  It just, when we went off a drop off, I remember saying a few words to hitting the brakes trying to stop, and that's the last I remember.
Q.  Okay.  You went off a drop off, the front part of your bike went off a drop off?
A.  The whole bike.
Q.  Okay.  But going forward, it wasn't like you tipped off the…
A.  Yeah, I just…
Q.  Okay.  As you were entering into the intersection, there's a stop light at the intersection, correct, yes?
A.  Yes.
Q.  Okay.  You had the green light coming into the intersection?
A.  Yes.
Q.  Okay.  Do you know how long before you entered the intersection before the light or that the light was green?
A.  No.
Q.  Okay.  Do you recall even seeing it red at any point?
A.  No.
Q.  Okay.  So at least to the best of your recollection it was pretty much clear green the whole way?
A.  Yes.
Q.  Okay.  As you approached the intersection, did you see any signs talking about the construction?
A.  No.

Q. Okay. Do you remember not seeing signs or you don't remember whether you did?

A. I don't recall seeing them, like I said, I don't remember hardly anything.

Q. Okay. When you entered into the intersection of Allentown and Cable, did you just continue straight or did you kind of merge to the left at all?

A. I continued straight I believe.

Q. Okay. Did you see any indication of construction, any barrels?

A. Yes, I seen two big barrels, that's why I assumed it looked like the road was open straight ahead, it wasn't like blocked off with lights or anything.

Q. Okay. Let me talk about that a little bit. So in front of you you saw two big barrels?

A. Off to the sides.

Q. Okay.

A. Like the road was opened.

Q. Okay. Any idea approximately how far apart those barrels were?

A. Like a lanes width where it looked like the whole lane was open, that's why I started to proceed through there.

Q. Okay. The car in front of you I think you said went to turn left?

A. I believe it turned right.

* * *

Q. Okay. Did you, do you recall seeing any lane markers indicating that the lane would merge to the left?

A. What do you mean by markers?

Q. Painted lines?

A. No, it was very dark out, I don't recall really anything there.

* * *

Q. Okay. That's fair, these are horrible pictures. Do you know whether your motorcycle hit any barrels?

A. I don't recall any.

Q. Okay.

**A. I just remember going off the drop off and trying to hit the brakes and that was the last I remember, they like cut the road and it dropped down, I dropped down into those stones.**

**\* \* \***

**Q. Was there a road closed sign that you remember?**
**A. I don't recall nothing like that at all.**
**Q. How wide or far apart were the two barrels that you identified for Fort Defiance's counsel?**
**A. I thought there was like a good lane, where like the lane was opened and it was to the side showing don't go off this side or this side, I thought the lane was opened so, you know, a car could drive through.**

(Prater Dep. at 23-27, 28, 32, 70). While Prater acknowledged that he had been drinking the night of the accident, and was cited for an OVI and failure to control a vehicle, he did state that his lack of memory about the accident was not because of the amount of alcohol that he had had that night. (Prater Dep. at 16, 17, 35).

{¶11} In addition to Prater's testimony, Lhamon also cites to the MOT in support of her argument. The MOT is the specific construction plan that Fort Defiance designed for the project, and which was approved by ODOT. The language on page 8 of the MOT specifically states "*Drums @ 10' Spacing.*" (Plaintiff's Ex. 2, emphasis added). Moreover, according to the General Specifications, which also was submitted to and approved by ODOT, where a drop-off is involved it states that "[w]hen drums are specified for a drop-off condition, a minimum number of four drums shall be used. Spacing shall be indicated in the plans or as specified in the OMUTCD." (Rath Dep. at 30);

(Plaintiff's Ex. 1, p. 8). Furthermore, per the General Specifications, no changes were allowed to be made without the written approval of the district construction engineer. (Rath Dep. at 32); (Plaintiff's Ex. 1, p. 7). No one could recall a request for a change to the MOT ever being made. (Rath Dep. at 32); (Shanahan Dep. at 37-38).

{¶12} However, also in the MOT on page 2, there is a diagram illustrating the wedge treatment for Phase I, and in its illustration it provides for 'Drum/42" Cone.' (Shanahan Aff. at ¶7); (Plaintiff Ex. 2). In addition, according to the terms of the project contract, once the MOT was submitted to ODOT for approval, the district was to have 14 calendar days to review and comment on the MOT. The MOT was submitted for approval on or about April 6, 2007, and on or about April 9, 2007, consistent with the adoption of the MOT, an e-mail was sent from Shanahan's immediate supervisor to Shanahan discussing the use of grabber cones instead of barrels. (Shanahan Dep. 8, 11-16); (Plaintiff's Ex. 11). In the e-mail it stated that there had been a discussion about using grabber cones with the drop-off at the edge at the Allentown road, and whether the parties would have to submit a formal request to use the cones at that location. (Plaintiff's Ex. 11). Ultimately, it was concluded that a formal written request was not needed because the UMTCD specifically allowed for the use of grabber cones. (Id.).

{¶13} We also note that Lhamon's testimony did not offer any additional insight as far as the details of the night of the accident. Lhamon could only remember that she knew they were approaching a construction site at the intersection the night of the accident, but that the next thing she remembered was waking up in the trauma room at the hospital. (Lhamon Dep. at 39).

{¶14} The record also reveals that Fort Defiance submitted an affidavit from Shanahan, ODOT's project engineer/supervisor. Shanahan stated that Fort Defiance's MOT had been approved by ODOT before work on the project had commenced, and that as part of his responsibilities as project engineer, he had been on-site on the project every day, including Friday, June 29, 2007, and Monday, July 2, 2007. (Shanahan Aff. at ¶¶7-8). He also stated that the use of grabber cones was permissible on 2-lane roadways, and had been approved by the Office of Traffic Engineering. (Shanahan Aff. at ¶11). Furthermore, Shanahan also had a duty to conduct daily inspections, and based upon his inspections of the construction site on the project, including the inspections conducted on June 29, 2007, and July 2, 2007, Fort Defiance had been in compliance with the MOT plan as it related to "all safety barriers, traffic channeling and signage requirements." (Shanahan Aff. at ¶¶10, 12).

{¶15} In addition to Shanahan's affidavit, Shanahan testified at his deposition that because of the type of construction being done on the project, there

was no need for any type of barricades or closure notifications of the lanes of traffic; instead, since they were not technically closing the road, all that was needed were channelization devices to channel the traffic into a certain portion of the pavement. (Shanahan Dep. at 24, 42). He stated that drums and cones are considered proper channeling devices, and both grabber cones and drums were used on Phase I of the project. (Id. at 33, 37, 42). While Shanahan acknowledged that any modifications to the MOT would have to have been done through a written change order, this requirement only applied to significant modifications and using grabber cones instead of drums was not considered a significant modification to warrant such a change order. (Id. at 38-40). In fact, when asked about the MOT plan, with respect to the channelization devices, Shanahan stated that regardless of the language used, in particular the use of the word "drum," the use of grabber cones was acceptable to ODOT and consistent with the MOT. (Id. at 55-56).

{¶16} Based on the foregoing, we believe that Lhamon has failed to demonstrate that a genuine issue of material fact exists concerning whether Fort Defiance breached its duty of care by not complying with the MOT plan when it used grabber cones instead of drums. Lhamon only points to two sections in the MOT which specifically use the word "drum" for her argument that Fort Defiance had a duty to use drums in order to comply with the MOT. In addition, she claims

that the only appropriate way Fort Defiance could have used grabber cones was if it would have submitted a formal change order to ODOT. However, despite Lhamon's assertions, there is uncontroverted testimony that Fort Defiance had complied with the MOT as it related to all safety barriers and channelization devices on the day of the accident. Furthermore, despite the few times the MOT used the word "drum," there is also uncontested evidence that the use of grabber cones was acceptable to ODOT and consistent with the MOT.

{¶17} Lhamon also claims that Prater's testimony raises a genuine issue of material fact that Fort Defiance breached its common law duty of care, specifically because he believed that it was a clear lane ahead of him because he saw two drums about a lane-width apart. Prater's testimony may be sufficient to raise a genuine issue of material fact with respect to whether Fort Defiance breached its common law duty of care to the traveling public. See *Fannin v. Cubric* (1970), 21 Ohio App.2d 99, 105, 255 N.E.2d 270. Nevertheless, Lhamon only argued in her original complaint and throughout the course of the lower court proceedings that Fort Defiance breached its duty of care by failing to comply with the MOT. A litigant who had the opportunity to raise a claim in the trial court, but failed to do so, has waived the right to raise that claim on appeal. *Janosek v. Janosek*, 8th Dist. Nos. 91882, 91914, 2009-Ohio-3882, ¶44. Thus, we find that she has waived

the argument regarding Fort Defiance's breach of the common law duty of care for purposes of this appeal.

{¶18} Lhamon only claimed that Fort Defiance breached its duty of care by failing to comply with the MOT when it used grabber cones instead of drums at the construction site, and the evidence shows that not only did Fort Defiance comply with the MOT, but that it was not inconsistent to use grabber cones instead of drums at the construction site. Thus, Lhamon has failed to demonstrate that a genuine issue of material fact exists with respect to the issue of whether Fort Defiance breached its duty of care by using grabber cones instead of drums. Consequently, the trial court did not err when it granted Fort Defiance's motion for summary judgment with respect to the issue of grabber cones and drums.

<u>Pile of Stones</u>

{¶19} With respect to the pile of stones, Lhamon claims that the trial court erred by not properly construing all of the evidence in a light most favorable to her (the nonmoving party) when it determined Fort Defiance's summary judgment motion. Specifically, she argues that the trial court only considered Shanahan's testimony when finding that there was a lack of evidence that a pile of stones existed, and that even if it did exist, Fort Defiance had complied with the MOT, and therefore, it did not breach its duty of care.

{¶20} First of all, contrary to Lhamon's assertions, the trial court did state that, when construing all of the evidence in a light most favorable to Lhamon, there was at least an "inference that a pile of stones existed at the east end of the construction zone." (May 29, 2009 JE at 6). In addition, we also note that the trial court never formally concluded that there was no genuine issue of material fact that the existence of a pile of stones amounted to a breach of duty; rather, the trial court concluded that even if the pile of stones existed and amounted to a breach, the plaintiff had failed to demonstrate a genuine issue of material fact regarding whether the pile of stones was the proximate cause of the accident. (Id. at 8).

{¶21} Our review of the record reveals that, as stated above, Lhamon only remembered approaching a construction site at the intersection the night of the accident, and then waking up in the trauma room at the hospital. (Lhamon Dep. at 39). Prater was equally unsure as far as what happened after he went through the intersection and dropped off into the construction site. Prater only provided the following testimony regarding the pile of stones at the construction site:

> **Q. Okay. So what happened, tell me to the extent you know why, I mean what you did, what the motorcycle did, when you entered into the intersection of Allentown and Cable.**
> **A. It just, when we went off a drop off, I remember saying a few words to hitting the brakes trying to stop, and that's the last I remember.**
> **Q. Okay. You went off a drop off, the front part of your bike went off a drop off?**
> **A. The whole bike.**

-16-

\* \* \*

**A. I just remember going off the drop off and trying to hit the brakes and that was the last I remember, they like cut the road and it dropped down, I dropped down into those stones.**

\* \* \*

**Q. Okay. Now, in Exhibit 3 do you see what appears to be a pile of gravel there or stone, correct?**
**A. Yes.**
**Q. At any time on the night of the incident, do you recall seeing that pile of gravel?**
**A. No.**
**Q. When did you first learn that that pile of gravel was there?**
**A. After I was in the hospital and was told that I hit it.**
**Q. And who told you that?**
**A. One of my friends, there was quite a few people who came up to see me, they said I went off a drop off and hit a pile of stones and went flying. All I remember is the drop off and that's the last I remember.**
**Q. And if you remember, when you talk about going off the drop off, do you clearly have a memory of dropping off the pavement where it's cut or could that have been the pile of stone you hit and went over the back side of it?**
**A. No, I remember trying to brake because once I got up there I seen what was going on, I seen that there was, you know, it was cut out and this lane was not opened then.**

(Prater Dep. at 23-27, 32, 66-67).

**{¶22}** Additionally, Lhamon submitted an affidavit from Deputy Bradley A. Baty of the Allen County Sheriff's Department, which stated that he was the officer who had responded to the dispatch concerning a single motor vehicle accident at the intersection of Allentown Road and Cable Road. (Baty Aff. at ¶¶2-3). While at the accident scene, he took several photographs, including the

photograph marked Exhibit A (later identified as Plaintiff's Exhibit 7), which illustrated a pile of stones he had observed at the east end of the construction site during the early morning hours on June 30, 2007. (Baty Aff. at ¶¶3-4); (Plaintiff's Ex. A). This Court notes that Plaintiff's Exhibit 7 depicts the east end of the construction site sometime at night and there are grabber cones placed in a line all the way down the left side of the construction site. (Plaintiff's Ex. 7). In the middle of the photograph, there is a pile of loose stones, and farther down in the background beyond the pile of stones is a motorcycle lying on its side. (Plaintiff's Ex. 7).

{¶23} Similarly, Fort Defiance submitted an affidavit from Shanahan which stated that he had been on-site during the project, including Friday, June 29, 2007 and Monday, July 2, 2007. (Shanahan Aff. at ¶¶2, 8). As part of his responsibilities, Shanahan stated that if there would have been anything inconsistent with the approved MOT plan, then he would have made the contractor aware of the problem and would have shut down the construction work until the problem was fixed. (Shanahan Aff. at ¶11). However, based upon his inspections of the construction site on the project, including the inspections on June 29, 2007 and July 2, 2007, Fort Defiance was in compliance with the MOT plan as it related to all safety barriers, traffic channeling and signage requirements. (Shanahan Aff. ¶12). Furthermore, during Shanahan's deposition, he testified that when there is

an excavation directly adjacent to pavement it typically creates a drop off situation, but this was not present in this particular case because when they had cut the old pavement out, they had placed stone up against it and ramped the stones down to the existing stone grade. (Shanahan Dep. at 29). Shanahan stated that during Phase I of the project this stone ramp had been maintained throughout the entire time that the excavation existed, and ultimately, he concluded that there had been "no danger to the public anywhere that we could foresee because we had the existing pavement ramped on to a reasonably all weather surface." (Shanahan Dep. at 30, 49-50). With respect to the existence of a pile of stones the night of the accident, Shanahan said that he could not recall seeing such a pile at the east end of the construction site the day of the accident, nor could he recall seeing a pile of stones on July 2nd, the day that he went back to work. (Shanahan Dep. at 50). Even when he was shown Plaintiff's Exhibit 7, Shanahan was unable to say whether the pile of stones in the photograph was at the end of the construction site or not. (Shanahan Dep. at 50). However, Shanahan did state that if he had seen such a pile of stones at the end of the construction site, he would have had to evaluate where it was and what it was doing in that particular place before deciding whether to remove it or not. (Shanahan Dep. at 51). Nevertheless, he did testify that there was nothing in the "specs" that would have allowed a pile of stones at the end of the project like it was depicted in the photograph, and in fact

stated that "[w]e don't put piles of stones at the end of projects." (Shanahan Dep. at 51).

{¶24} Overall, based on the foregoing, we believe that there is a genuine issue of material fact concerning whether the existence of a pile of stones was a breach of Fort Defiance's duty of care. In particular, as to the existence of a pile of stones, when construing the evidence in a light most favorable to Lhamon, we believe that there is at least some evidence that indicates that such a pile of stones existed on the night of the accident. Specifically, the photograph taken by Deputy Baty, which depicts a pile of stones at the east end of the construction site the night of the accident, at least raises an inference that a pile of stones existed. Moreover, Shanahan's statement that the plan did not allow for a pile of stones to be placed at the end of a construction, and his statement that "[w]e don't put piles of stones at the end of projects," raises a genuine issue of material fact regarding whether the existence of such a pile of stones amounted to a breach of duty.

{¶25} In addition, Lhamon claims that the trial court erred when it determined that there was no evidence demonstrating that the pile of stones at the east end of the construction site was the proximate cause of Lhamon's injuries. Despite the fact that we find that there is a genuine issue of material fact regarding whether the existence of a pile of stones amounted to a breach of duty, we believe

that Lhamon has failed to demonstrate that there is a genuine issue of material fact concerning whether the pile of stones was the proximate cause of her injuries.

**{¶26}** Proximate cause is

> **"that which in a natural and continued sequence contributes to producing the result, without which it would not have happened. The fact that some other cause concurred with the negligence of a defendant in producing an injury, does not relieve him from liability unless it is shown such other cause would have produced the injury independently of defendant's negligence."**

*Kemerer v. Antwerp Bd. of Edn.* (1995), 105 Ohio App.3d 792, 796, 664 N.E.2d 1380, quoting *Piqua v. Morris* (1918), 98 Ohio St. 42, 120 N.E. 300.  This Court has previously held that while it may be true that the issue of proximate cause is best left for the trier of fact when the facts surrounding the issue of proximate cause are disputed or convoluted, nevertheless, "'[w]here no facts are alleged justifying any reasonable inference that the acts or failure of the defendant constitute the proximate cause of the injury there is nothing for the jury, and, as a matter of law, judgment must be given for the defendant.'"  *Kemerer*, 105 Ohio App.3d at 796, quoting *Case v. Miami Chevrolet Co.* (1930), 38 Ohio App. 41, 45-46, 175 N.E. 224.  "If evidence on the question of proximate cause is so meager and inconclusive that a finding of proximate cause would rest on speculation and conjecture, the defendant is entitled to summary judgment as a matter of law."  *Schutt v. Rudolph-Libbe, Inc.* (Mar. 31, 1995), 6th Dist. No. WD-94-063.  See,

also, *Renfroe v. Ashley* (1958), 167 Ohio St. 472, 150 N.E.2d 50; *Whiting v. Ohio Dept. of Mental Health* (2001), 141 Ohio App.3d 198, 203, 750 N.E.2d 644.

{¶27} Here, there is absolutely no evidence in the record that would support a reasonable inference that the existence of a pile of stones proximately caused Lhamon's injuries. Lhamon claims that Prater's testimony would support such an inference; however, Prater never testified about what actually caused him to lose control of his motorcycle. The only thing he could clearly remember was going off the drop off and landing in stones, but he could not recall ever seeing a pile of stones or whether he even hit anything after his motorcycle went off the drop off. Lhamon also claims that a reasonable inference can be drawn from Deputy Baty's photograph of the scene of the accident, which depicts a pile of stones at the east end of the construction site, along with in the background the motorcycle lying on its side. Lhamon is essentially asking this Court to find that because the motorcycle is lying on its side behind the pile of stones, Prater must have hit the pile of stones. However, such a finding by this Court would rest on speculation and conjecture since there is no other testimony or physical evidence, such as visible tire markings in the stones, for this Court to rely on in making such an inference. *Schutt*, 6th Dist. No. WD-94-063.

{¶28} Therefore, with respect to the issue of the pile of stones, because Lhamon has failed to demonstrate that there exists a genuine issue of material fact

concerning whether the pile of stones was the proximate cause of her injuries, we find that the trial court did not err when it granted Fort Defiance's motion for summary judgment. *Kemerer*, 105 Ohio App.3d at 796.

{¶29} Overall, we find that the trial court did not err when it granted Fort Defiance's motion for summary judgment. With respect to the use of grabber cones instead of drums, Lhamon has failed to demonstrate that there exists a genuine issue of material fact regarding whether Fort Defiance breached its duty of care by failing to comply with the MOT plan by using grabber cones instead of drums. In addition, even though there exists a genuine issue of material fact on whether the existence of a pile of stones amounted to a breach of Fort Defiance's duty of care, there is no evidence in the record to demonstrate that a genuine issue of material fact exists concerning whether the pile of stones was the proximate cause of Lhamon's injuries.

{¶30} Lhamon's first and second assignments of error are, therefore, overruled.

{¶31} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jnc**

-23-